# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| SARA JANE SABBAGH, | : |
| Plaintiff, | : CIVIL ACTION NO. 3:12-cv-449 (SRU) |
| v. | : |
| JPMORGAN CHASE BANK, N.A., | : |
| Defendant. | : MAY 21, 2013 |

## PLAINTIFFS' SECOND AMENDED COMPLAINT

Pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure, Plaintiff Sara Jane Sabbagh respectfully submits this Second Amended Complaint.

## PARTIES

1.     Plaintiff Sara Jane Sabbagh ("Plaintiff") is a resident and citizen of Connecticut.  She is the borrower on a loan secured by a mortgage on her residence and property at 168 Hungary Road in Graby, Connecticut ("the Property"), where she resides with her children.  The loan on the Property was and is serviced by Chase Home Finance, LLC.

2.     Defendant JPMorgan Chase Bank, N.A. is a multinational banking corporation, which provides services including consumer banking, credit cards, and mortgage loans.  Upon information and belief, JPMorgan Chase Bank, N.A. is incorporated in Delaware and maintains its headquarters in New York.  On or about May 1, 2011, Chase Home Finance, LLC was merged into JPMorgan Chase Bank, N.A.[1]

---

[1] For ease of reference, this Second Amended Complaint will refer to the defendant as "Chase."

## JURISDICTION AND VENUE

3.      Pursuant to 28 U.S.C. § 1332(a)(1), this Court holds subject matter jurisdiction in this case because Plaintiff and Chase are citizens of different states and the amount in controversy exceeds $75,000.

4.      This Court holds personal jurisdiction over Chase because Chase transacts business in Connecticut.

5.      Pursuant to 28 U.S.C. § 1391(b)(1)-(2), venue is proper in the District of Connecticut.

## STATEMENT OF FACTS COMMON TO ALL COUNTS

### Mortgage Loan

6.      On or about October 11, 2006, Plaintiff and her then-husband, Stefan Sabbagh, secured a mortgage loan, through Chase, for the Property.  Plaintiff's monthly payment on this loan was $2,722.92.  Plaintiff also secured a second mortgage at the same time, through Suntrust Mortgage, Inc., which is not at issue in this litigation.

7.      Plaintiff and her husband entered into divorce proceedings in 2009.

8.      Despite losing a substantial source of her family's income as a result of the divorce, Plaintiff remained current on her monthly mortgage payments.  However, she sought to refinance the mortgage on the Property so that she could afford to remain there with her child.

### Loan Modification Application

9.      After being denied a refinancing of her mortgage by Chase through Connecticut Home Mortgage, Plaintiff contacted Chase directly to inquire about a loan modification.  She followed Chase's instructions by completing the required application and submitting the required supporting documents.  Plaintiff completed this application by June 12, 2009.

10.     Though Chase promised to contact Plaintiff within 21 days of her application, it failed to do so.  Plaintiff contacted Chase numerous times, beginning on July 22, 2009, and was given conflicting and misleading information by Chase, including that her application was complete, that she was required to submit additional materials, that she would receive a decision in two weeks, that she would receive a decision within 60 to 90 days, and that she would receive a decision within 30 days.  Plaintiff complied immediately with all of Chase's requests for additional information.

11.     Chase told Plaintiff on August 24, 2009, in a phone call initiated by Plaintiff, that her application for a loan modification had been denied.  A Chase representative instructed her to submit a new loan modification application, with numerous and duplicative supporting documents, with "APPEAL" written on the application.  Plaintiff complied promptly and was informed that a Chase employee had submitted her application for an "escalated review."

12.     In her subsequent communications with Chase, Plaintiff learned that her application had not, in fact, been submitted for such an "escalated review" because of Chase's "policy for percentages."

13.     Upon information and belief, Chase is a servicer of the federal government's "Home Affordable Modification Program" ("HAMP") plan.

14.     Upon information and belief, HAMP guidelines provide for an "affordable modification" in which the homeowner's new monthly mortgage payment – including principal, interest, property taxes, insurance, and association fees ("PITIA") – is no more than 31% of the homeowner's monthly gross income.

15.     On different occasions, Chase representatives told Plaintiff that Chase used higher PITIA percentages, such as 32% or 37%.  This information provided by Chase was false.

3

16.     On September 14, 2009, a Chase representative told Plaintiff to have her file sent, via fax, from one office at Chase – a "Representative Point of Contact" – to Chase's "Home Preservation Office." In her attempts to comply, Plaintiff was told that the "Representative Point of Contact" would not send her application to the "Home Preservation Office" and did not receive any response to her other phone inquiries. In an effort to ensure her file was received by Chase's "Home Preservation Office," Plaintiff compiled all of her own documents and sent them directly to Chase's "Home Preservation Office," via fax. In Plaintiff's efforts to confirm receipt of these documents, Chase representatives failed to complete even the simple task of transferring Plaintiff to the correct voicemail message box.

### Chase Induces Plaintiff to Default on Mortgage to Obtain Loan Modification

17.     The next day, on September 15, 2009, Plaintiff contacted Chase's "Home Preservation Office" and spoke with a supervisor in the department named "Matt," who told her that Chase would do whatever it could to help her keep her home, but that Chase could only help Plaintiff once Plaintiff went delinquent on her mortgage and her account was in default. When Plaintiff inquired about what would happen if her loan modification was declined, "Matt" explained that Plaintiff would simply receive a bill at the end of the process.

18.     Later the same day, Plaintiff contacted Chase and was told again, by a separate Chase representative named "Scott," that Plaintiff had to be delinquent on her mortgage in order to obtain a loan modification. "Scott" instructed Plaintiff, once she went delinquent, to call immediately after the payment due date had passed. "Scott" promised that, at that time, Chase would give Plaintiff an update on her loan modification application.

4

19.     Upon information and belief, the guidelines established by the HAMP program <u>did</u> <u>not</u> require Plaintiff to go delinquent on her mortgage before she could modify her loan.  Thus, the information provided by Chase was false.

20.     On September 16, 2009, "Tracey Price," a representative from Chase's executive offices, contacted Plaintiff, apparently in response to a message Plaintiff had left at Chase's executive offices about Chase's representations to Plaintiff that she must go delinquent on her mortgage in order to obtain a loan modification.  "Tracey Price" asked Plaintiff to resubmit various documents and promised to call Plaintiff the next day.  Though Plaintiff complied immediately, "Tracey Price" failed, over the next several weeks, to call Plaintiff or to return any of Plaintiff's messages.

21.     In reliance on Chase's multiple instructions that Plaintiff must go delinquent on her mortgage in order to be considered for a loan modification, Plaintiff intentionally did not make her September 2009 monthly mortgage payment so that she would qualify for Chase's loan modification program.  She later received a mortgage statement from Chase showing that her escrow account had a negative balance.

22.     Between September 22, 2009 and October 11, 2009, Plaintiff contacted Chase on numerous occasions to determine the status of her loan modification.  Chase again gave her conflicting and misleading information, promising a decision within two weeks or that very day, and consistently failing to communicate accurate information to Plaintiff regarding her application status.

23.     In an October 12, 2009, phone call to Chase, Plaintiff learned that Chase had declined her request for a modification, citing an insufficiently low "housing ratio."  Though Plaintiff protested that she satisfied the federal guidelines for a modification, a Chase representative told her that the rules had changed, that the rules only applied when an applicant was current on her

5

mortgage, and that Chase could formulate its own rules that were different than the HAMP guidelines. Since Plaintiff was receiving a loan modification pursuant to HAMP, these representations were false.

24.     Plaintiff, of course, had only gone delinquent on her mortgage after Chase representatives repeatedly instructed her to do so, and only because Chase representatives promised to help her if she did so.

25.     Also on October 12, 2009, a Chase representative named "Scott Crego" told Plaintiff that, in its decision to deny Plaintiff a loan modification, Chase had valued Plaintiff's property taxes at a level which Plaintiff knew to be incorrect. Pursuant to Chase's instructions, Plaintiff secured a letter from her town stating the correct tax amount and immediately sent this letter, as well as new documentation, to Chase.

26.     On October 14, 2009, a Chase representative named "Adrien" informed Plaintiff that she could pursue a "regular refinance" or a "streamline refinance" if the loan modification was not approved. When Plaintiff subsequently attempted to initiate a "streamline refinance," a Chase representative named "Ken" told Plaintiff she did not qualify because Chase did not have Plaintiff's original loan documents in its possession.

27.     That same day, Plaintiff left another message at Chase's executive offices for "Tracey Price" informing her that Chase representatives had told her to go delinquent in order to obtain a loan modification. This call did not receive any response from anyone at Chase.

28.     Throughout the rest of October 2009, Plaintiff complied with Chase's request to submit even more additional documents in support of her application for a loan modification, and relied on Chase's promises that she "hold tight" and that Chase would "get this done" for her.

**Trial Modification**

29.     On October 23, 2009, Plaintiff learned from a Chase representative named "Shauna" that she had been approved for a loan modification, with a new monthly payment of $2,227.18. Another Chase representative, "Scott Crego," told Plaintiff that she did not have to pay her monthly mortgage payments for October 2009 or November 2009, and that the payments would be factored into the principal and all late fees forgiven.

30.     Shortly thereafter, Plaintiff received a mailing from Chase, containing a letter and a HAMP Trial Period Plan ("the Trial Modification"). This Trial Modification called for a monthly payment of $2,227.18. The letter specifically instructed Plaintiff that "[t]o accept this offer and enter into the Home Affordable Modification program, all borrowers must sign and return once copy of the enclosed Trial Period Plan – along with your first trial period payment in the amount of $2,227.18 – by no later than NOVEMBER 21, 2009."

31.     Plaintiff executed and returned the Trial Modification and made her first payment thereunder in November 2009. On November 7, 2009, Plaintiff spoke to a Chase representative named "Usheka," who confirmed that Chase had received this payment on November 3.

32.     Despite accepting the Trial Modification, and making payment accordingly, Plaintiff received a mortgage statement from Chase in December 2009 showing that Plaintiff owed a payment due in the amount of $8,639.31. The statement also showed that Plaintiff's payments were being held in suspense and not applied to her account.

33.     From December 2009 through March 2010, Plaintiff again endured countless contacts with Chase wherein the company's representatives gave her misleading and conflicting information. She was told, inter alia, that her file was complete and under review, but later that she must provide multiple additional documents; that the Trial Modification would be final within 30 to 60 days, but

later that it would need to be extended for an additional three months; and that Plaintiff might not

qualify for a permanent loan modification because Plaintiff's home held equity, but later that this

was an error and that Plaintiff should continue making payments pursuant to the Trial Modification.

### Final Modification

34.　　Finally, on April 8, 2010, Plaintiff received a mailing from Chase containing the

finalized loan modification ("the Final Modification"), with a monthly mortgage payment of

$2,227.94.  The Final Modification instructed that Plaintiff "[t]o accept your modification, <u>you must</u>

<u>sign and return both copies</u> of the Modification Agreement <u>to us in the enclosed, pre-paid envelope</u>

by APRIL 21, 2010" (emphases in original).  Relying on Chase's prior representations and her

submission of corrected tax information, Plaintiff executed and returned the required documents,

noting that the signature line of her former husband need not be signed, per the documents'

instructions.

35.　　The next month, Plaintiff received another letter from Chase containing another copy

of the Final Modification, with an explanation that Plaintiff had incorrectly completed the earlier

copy when she noted on the document that her former husband's signature was not required.  Chase

instructed Plaintiff to execute correctly and return the Final Modification documents.  Again, in

reliance on Chase's prior representations and her submission of corrected tax information, Plaintiff

did so that same day.

36.　　Plaintiff received a letter from Chase on May 25, 2010, informing her that she had

"completed the requirements for a permanent modification to [her] Loan," in the form of the Final

Modification.  Chase also stated that it "enclosed a signed copy of the Loan Modification Agreement

for [Plaintiff's] records."  Plaintiff's June 2010 statement showed her monthly payment as $2,227.94.

## Chase Wrongfully Refuses to Correct its Error in Final Modification

37.    However, by October 2010, Plaintiff received a notice from Chase informing Plaintiff that she had a negative escrow balance of $5,427.05 and that Plaintiff's monthly payment would be increasing to $2,588.

38.    When Plaintiff contacted Chase to inquire about the change, a Chase representative named "Carlo" informed her that Chase had relied on the incorrect tax information in calculating the Final Modification.  Over the next several weeks, Plaintiff attempted to communicate with Chase to get the company to correct the error.  Chase representatives repeatedly refused to do so, and in fact failed even to return Plaintiff's calls on several occasions.  In fact, on October 14, 2010, a Chase representative named "Shamika" put Plaintiff on hold for one full hour.

39.    During these contacts, Chase representatives on at least two occasions told Plaintiff that, even though Chase had made a mistake, the Final Modification could not be corrected.  The first representation was made on October 14, 2010 by a Chase representative named "Sonia."  The second representation was made on October 25, 2010 by Chase representative "Scott Crego."  These representations were in direct conflict with the express terms of the Final Modification, wherein Plaintiff and Chase contracted that the parties would, inter alia, "execute such other documents as may be reasonably necessary to . . . correct the terms and conditions of this Plan if an error is detected after execution of this Agreement" (emphasis added).

40.    On November 1, 2010, a representative from Chase's legal department named "Karen Brown" admitted to Plaintiff that "Scott Crego" should have forwarded the corrected tax information to Chase's escrow department, but had failed to do so.  "Karen Brown" informed Plaintiff that Chase's Research Department could open a file and review the issue.  She also posted a temporary payment in the amount of $2,227.94 to Plaintiff's account for November 2010.

9

41.     On December 2, 2010, Plaintiff was contacted by a Chase representative named "David Stagart," who requested numerous financial documents from Plaintiff.  He promised Plaintiff that Chase had been told by Freddie Mac to correct the error and issue a corrected loan modification. That same day, "Karen Brown" posted a temporary payment in the amount of $2,227.94 to Plaintiff's account.

42.     Several days later, on December 6, 2010, Plaintiff received another phone call from a Chase representative named "Chris," who asked her to send in yet another application to modify a loan, along with supporting documentation.  Though Plaintiff had already provided such information numerous times, and in fact had a binding Final Modification in place with Chase, she once again complied with Chase's request, and submitted the information that same day.

43.     After not receiving any update after more than two weeks, on December 21, 2010, Plaintiff contacted "Chris" and inquired as to the status of her account.  "Chris" informed Plaintiff that she had been declined for an "investor program," for which Plaintiff had not even applied. Despite her repeated requests, Plaintiff received no update concerning Chase's promised efforts to correct its mistake in the Final Modification.

44.     On December 29, 2010, a Chase representative named "David Long" contacted Plaintiff and told her that Chase would not fix its error in the Final Modification, even after Plaintiff drew his attention to the fact that the Final Modification specifically provided for the correction of errors.

45.     Plaintiff spent the remainder of December 2010 and January 2011 attempting to communicate with Chase to correct Chase's error in the Final Modification.  As usual, Chase largely ignored her.  However, on January 12, 2011, "Kristin Dixon" told Plaintiff that Freddie Mac was

reviewing Plaintiff's file.  Also, on January 14, 2011, "David Long" posted a temporary payment of $2,227.94 to Plaintiff's account.

46.    In a conversation with Freddie Mac representative "Shonta Brown" on January 25, 2011, "Shonta Brown" told Plaintiff that Chase had not informed Freddie Mac of Chase's error in the Final Modification.  "Shonta Brown" also indicated to Plaintiff that Chase needed to correct the error, and that Chase should have done so when Chase's error was discovered.

47.    Plaintiff next heard from Chase on February 7, 2011, when she called and spoke to "David Long," who told her that Chase would not correct its mistake in connection with the Final Modification.  As a justification for this refusal, "David Long" cited the fact that Plaintiff had put an addition on her home in 2008.  This addition, in fact, had been funded by Plaintiff's parents, who retired early and sold their own home to fund the addition so they could more easily stay at Plaintiff's home to help with Plaintiff's sick daughter.  It also preceded Plaintiff's divorce.  When Plaintiff asked "David Long," he could not identify for her any basis for refusing to correct the Final Modification because of a long-ago improvement to the property.

48.    The next day, on February 8, 2011, Plaintiff spoke again with "David Long," who indicated that the Final Modification would not be corrected and claimed that Freddie Mac would not allow it.

49.    In response, Plaintiff contacted Freddie Mac once again.  On February 15, 2011, Plaintiff spoke with Freddie Mac representative "Rudy Frazier," who informed Plaintiff that, since Chase was a delegated servicer, Chase could correct its error in the Final Modification without Freddie Mac's permission.

50.    Believing that Chase was not correcting the Final Modification in order to accrue fees on Plaintiff's account, and recognizing that such conduct would be an unlawful and unfair practice,

Plaintiff filed a formal complaint against Chase with the Federal Trade Commission in February 2011.

51.     On February 15, 2011, after Chase refused to post a temporary payment to Plaintiff's account for February 2011, Plaintiff made a payment of $2,227.94.  Plaintiff did so because she believed she needed to do so to save her home.

52.     On February 22, 2011, "Kristin Dixon" called Plaintiff and promised Plaintiff that Chase would resolve the situation and correct Plaintiff's credit.

### Corrected Modification

53.     Finally, on March 25, 2011, Plaintiff received an updated version of the Final Modification through the mail, in which Chase had finally corrected its error ("the Corrected Modification").  The agreement called for a monthly payment of $2,226.79, with a 2% interest rate for the first five years and a 4.75% interest rate for the eighth through 31st years.

54.     Using language similar to the Final Modification, the Corrected Modification instructed Plaintiff that "[t]o accept your modification, you must sign and return both copies of the Modification Agreement to us in the enclosed, pre-paid envelope by APRIL 08, 2011" (emphases in original).  Plaintiff signed and returned the Corrected Modification to Chase.

55.     Though the Corrected Modification called for a monthly payment of $2,226.79, "Kristin Dixon" instructed Plaintiff instead to continue paying $2,227.94 each month.  "Kristin Dixon" represented to Plaintiff that she and Chase were working to update Plaintiff's account to reflect the Corrected Modification, and that doing so would require a significant amount of work.

56.     Relying on the instructions of "Kristin Dixon," Plaintiff made a monthly payment of $2,227.94 to Chase for every month during the rest of the 2011 calendar year.

57.     In January 2012, Plaintiff made an online payment of $2,227.94 to Chase, as she had been, per Chase's instructions.

58.     Plaintiff subsequently learned that Chase had returned this payment to her bank. Upon contacting Chase to inquire, a Chase representative named "Paul" told Plaintiff that she should not make any payment for the month of January, and that making such a payment could jeopardize the processing of her Corrected Modification.

59.     Plaintiff became concerned, and spoke with "Kristin Dixon" – who had told Plaintiff to make the $2,227.94 payments until Chase finished updating Plaintiff's account to reflect the Corrected Modification – on January 23, 2011. "Kristin Dixon" accepted a payment from Plaintiff in the amount of $2,227.94.

60.     In February 2012, Plaintiff attempted to contact Chase several times to inquire about whether she should make a payment for February. Chase did not provide any response to such inquiries, but a Chase representative told Plaintiff that all of her payments were being held in suspense, and were not being applied to her account.

61.     In reliance on Chase's return of her previous payment, and the instructions of Chase representative "Paul" that she should not make a payment because doing so could jeopardize the Corrected Modification, Plaintiff did not make a payment for February 2012.

**Chase Wrongfully Refuses to Honor Corrected Modification**

62.     On February 22, 2012, a Chase customer service representative named "Allison Green," from Chase's Office of Comptroller of the Currency Department contacted Plaintiff and informed her that Chase would not be honoring the Corrected Modification, and instead would honor only the incorrect Final Modification. When Plaintiff reacted with shock at Chase's continued outrageous conduct, "Allison Green" responded by laughing derisively at Plaintiff several times.

13

Chase representative "Andrea Jaffe," the supervisor for "Allison Green," promised to send Plaintiff a written statement of Chase's new position, but failed to do so.

63.     The next day, on February 23, 2012, Plaintiff called "Kristin Dixon" and informed her of the previous day's events. "Kristin Dixon" admitted to Plaintiff that she had "no idea" why "Allison Green" and "Andrea Jaffe" had told Plaintiff that the Corrected Modification would not be honored. "Kristin Dixon" further represented to Plaintiff that she was working on finalizing the Corrected Modification, and planned to have Freddie Mac review Plaintiff's file during the first week of March 2012.

64.     In the meantime, Plaintiff received a Form 1098 documenting the mortgage interest tax information, which did not reflect the mortgage payments Plaintiff had made during 2011, because Chase had persisted in its refusal to apply Plaintiff's payments to her account and instead kept her funds in suspense. As a result, an incorrect interest amount for Plaintiff was reported to the IRS by Chase. Despite repeated attempts over the following months, Chase refused to correct its mistake and Plaintiff was forced to submit her 2011 tax return with the incorrectly low interest payment reflected in Chase's Form 1098. This negatively affected Plaintiff's tax refund. Thereafter, Chase sent Plaintiff another Form 1098, this time incorrectly indicating that Plaintiff had paid zero interest for 2011, forcing Plaintiff to pay even more in incorrect taxes.

65.     On March 6, 2012, a Chase supervisor named "Brenda Nichols" called Plaintiff and told her she was delinquent by five payments. Plaintiff disputed this characterization, explaining that she had paid all through January 2012, and that she had not submitted a February 2012 payment because Chase had returned her initial January payment. "Brenda Nichols" represented to Plaintiff, once again, that Chase would not honor the Corrected Modification, and only the incorrect Final Modification. Plaintiff reiterated her request for Chase to issue this new position in writing, which

14

"Brenda Nichols" refused to do, stating that Chase's position was "verbal" only.  Finally, "Brenda Nichols" asked Plaintiff to make two payments that day, in exchange for which Chase would waive the other three.  Plaintiff refused, and told "Brenda Nichols" to contact "Kristin Dixon," who had repeatedly assured Plaintiff that the Corrected Modification was in effect.

66.     Later that day, "Brenda Nichols" called Plaintiff once again, this time with "Kristin Dixon" also on the line.  "Kristin Dixon" now told Plaintiff that Chase would not be able to amend the incorrect Final Modification – even though Plaintiff had accepted Chase's offer for the Corrected Modification, made payments pursuant to the Corrected Modification, and Chase had accepted those payments.  "Brenda Nichols" falsely represented to Plaintiff that the Final Modification had the lowest allowable interest rate, and again sought to convince Plaintiff to make two payments that day.  Plaintiff again asked Chase for this new position in writing, but "Brenda Nichols" again refused to do so.

67.     The next day, March 7, 2012, Plaintiff checked her mortgage statement on Chase's website.  Though Plaintiff had paid her payments through 2011 as Chase had instructed her, the statement showed a past-due amount of $12,891.35 with a due date of November 1, 2011, and an escrow balance of -$8,990.60.  Plaintiff was shocked and saddened that Chase had not applied any of her 2011 and 2012 payments to her account.

68.     By March 13, 2012, Plaintiff had become so scared of losing her home that she called "Brenda Nichols" to discuss her account.  Instead, "Andrea Jaffe" returned Plaintiff's call, at which time Plaintiff, in her desperation, offered to make the two payments which "Brenda Nichols" had previously demanded.  However, "Andrea Jaffe" told Plaintiff that this "offer" from Chase had expired.  When Plaintiff inquired further, "Andrea Jaffe" curtly told Plaintiff she should have asked such questions earlier and that Plaintiff's file would be closed.

15

69.     On March 15, 2012, Plaintiff again checked her mortgage statement on Chase's website.  In just eight days, Chase's statement now demanded an even more outrageous past-due amount of $56,721.94, and showed an escrow balance of -$25,220.18.  When Plaintiff desperately tried to make an online payment of $2,578.27, Chase's website refused and indicated it would only accept payment of the full $56,721.94.

70.     The same day, Plaintiff called Chase in an attempt to make a payment over the phone. Plaintiff spoke with a Chase representative named "Malika," who indicated to Plaintiff that the monthly payment would be the amount according to the incorrect Final Modification, $2,578.27. However, when Plaintiff tried to make the payment, "Malika" told her Chase's system still showed her account in suspense and would not accept the payment.  Afterwards, Plaintiff used her online bank account to send $2,578.27 to Chase – at an overnight cost – in the hope of avoiding foreclosure.

71.     On or around March 23, 2012, Plaintiff received a letter from Chase indicating that Chase would honor only the incorrect Final Modification.  This letter further stated that the Corrected Modification – sent almost a year earlier, on March 25, 2011 – had been "inadvertently" offered to Plaintiff.  In support, Chase cited "treasury guidelines" limiting Plaintiff to one modification over the life of the loan.  Apparently lost on Chase was the fact that Plaintiff had sought and obtained only one modification, and that the Corrected Modification was simply a fix for the error made by Chase in calculating the terms of the Final Modification.  Moreover, the contractual terms of the Final Modification affirmatively required the parties to correct such errors.

72.     This letter also admitted that Plaintiff had, in fact, made payments toward the Corrected Modification, even though Chase's statements showed that Plaintiff's payments were not being applied to her account and that the funds being held in suspense.

73.     This letter also contained several false statements, including the following:

16

      a.      That, in one of the March 6 phone calls, "as a gesture of customer service" Chase offered to amend Plaintiff's credit report to show she made payments from June 1, 2010 through March 1, 2012.

      b.      That Chase had advised Plaintiff that it would advance her payments and credit her loan in the amount of $6,682.82 toward the delinquency and spread the escrow over 60 months.

74.     Also on or around March 23, 2012, Plaintiff received <u>four</u> foreclosure notices from Chase, all on the same day.

75.     Chase began reporting Plaintiff as delinquent to credit bureaus, even though Plaintiff paid the monthly payments as Chase had instructed her to do.

76.     In spite of all of Chase's outrageous actions, Plaintiff has continued to pay her monthly mortgage, first in the amount of $2,227.94 as instructed by "Kristin Dixon," and later in the amount of $2,226.49, the amount set forth in the parties' agreement in the Corrected Modification.

77.     Chase has <u>blocked Plaintiff from accessing her account</u>, meaning she cannot retrieve any information concerning her account, including how (or whether) Chase is applying the payments she continues to make.

## Chase Has Wronged Other Consumers in Similar Ways

78.     Upon information and belief, Chase receives a monthly servicing fee, in the form of a fixed percentage of the unpaid balance of the loans which it services.

79.     Upon information and belief, Chase acted intentionally to delay Plaintiff's loan modification in order to collect such fees.

80.     Upon information and belief, Chase has committed similar acts upon other individuals, for which Chase has admitted making "embarassing" and "egregious" "mistakes." In connection with these unfair mortgage practices, Chase entered into consent orders with both the Federal Reserve and the Office of Comptroller of the Currency.

COUNT ONE:        VIOLATION OF CONNECTICUT UNFAIR TRADE PRACTICES ACT
                  ("CUTPA"), CONN. GEN. STAT. § 42-110b

1-80.   Plaintiff hereby incorporates the allegations stated in Paragraphs 1 through 80, as if fully set forth herein.

81.     Chase, in administering Plaintiff's mortgage loan, was engaged in trade or commerce.

82.     While Chase was engaged in trade or commerce by administering Plaintiff's mortgage loan, it engaged in unfair and deceptive acts and practices, including:

a.    Denying Plaintiff correct information concerning her mortgage loan and account.

b.    Promulgating false information to Plaintiff concerning her mortgage loan, her account, and her interactions with Chase.

c.    Denying Plaintiff access to her online account.

d.    Failing to credit payments made by Plaintiff to her account.

e.    Falsely inducing Plaintiff to go into default on her mortgage by representing to her that she was required to do so to modify her mortgage loan.

f.    Falsely instructing Plaintiff not to make payments pursuant to a binding contract.

g.    Upon information and belief, delaying modification of Plaintiff's loan and breaching contracts with Plaintiff, in order to collect service fees.

h.    Providing false tax information to Plaintiff, and failing to correct such information.

i.    Requiring Plaintiff to submit voluminous materials, sometimes duplicative of earlier document requests.

83.     Chase's conduct offends public policy, is immoral, unethical, oppressive, and/or unscrupulous, and causes substantial injury to consumers in several ways, including:

a.    By denying correct information, and promulgating false information, to consumers.

b.    By denying consumers access to their accounts.

18

    c.      By failing to credit payments made by consumers to their accounts.

    d.      By falsely inducing consumers to go into default on mortgage loans under the false impression that consumers were required to do so to modify their mortgage loans.

    e.      Upon information and belief, by delaying modification of consumers' mortgage loans, and breaching consumers' contracts, in order to collect service fees.

    f.      By providing false tax information to consumers, and failing to correct such information.

    g.      By requiring consumers to incur significant expense in submitting voluminous documentation, which Chase already possessed.

    h.      By providing consumers untimely, inaccurate, and/or conflicting information concerning their mortgage loans and accounts.

84.    Chase's conduct caused Plaintiff to suffer ascertainable losses, including economic losses from, _inter alia_, Chase inducing Plaintiff to go into default, Chase's failure to credit Plaintiff's payments to her account, Chase's provision of incorrect tax information regarding Plaintiff, Chase's failure to correct this incorrect tax information, Chase's threats to foreclose on Plaintiff, and damage to Plaintiff's credit.

**COUNT TWO:    BREACH OF CONTRACT**

1-84.    Plaintiff hereby incorporates the allegations stated in Paragraphs 1 through 84, as if fully set forth herein.

85.    Chase extended to Plaintiff an offer to contract by offering her the Trial Modification.

86.    Plaintiff accepted the offer for the Trial Modification by signing and returning the Trial Modification to Chase, and making payments according to the Trial Modification.

87.    Chase accepted Plaintiff's signed Trial Modification, as well as the payments Plaintiff made pursuant to the Trial Modification.

88.     Chase extended to Plaintiff another offer to contract by providing her with the Final Modification.

89.     Plaintiff accepted this offer to contract by signing and returning the Final Modification, signing and returning a second Final Modification at Chase's instruction, and making payments pursuant to the Final Modification.

90.     Chase accepted Plaintiff's signed and returned Final Modification, as well as the payments Plaintiff made pursuant to the Final Modification.

91.     The Final Modification provided, inter alia, that the parties would "correct the terms and conditions of this Plan if an error is detected after execution of this Agreement."

92.     Plaintiff performed her obligations under the Final Modification by making payments pursuant to its terms.

93.     Chase failed to perform its obligations under the Final Modification by, inter alia, holding payments made by the Plaintiff in suspense, failing to apply payments made by Plaintiff to her account, and failing to remedy its error in calculating the correct tax amount.

94.     Chase extended to Plaintiff another offer to contract by providing her with the Corrected Modification.

95.     Plaintiff accepted this offer to contract by signing and returning the Corrected Modification, and making payments according to (and in excess of) the amounts required by the Corrected Modification.

96.     Chase accepted Plaintiff's signed and returned Corrected Modification, as well as the payments Plaintiff made according to (and in excess of) the amounts required by the Corrected Modification.

97.     Plaintiff performed her obligations under the Corrected Modification by making payments according to (and in excess of) the amounts required by the terms of the contract.

98.     Chase failed to perform its obligations under the Corrected Modification by, <u>inter alia</u>, instructing Plaintiff not to make payments pursuant to the Corrected Modification, repeatedly informing the Plaintiff that it would not honor the Corrected Modification, holding payments made by the Plaintiff in suspense, failing to apply payments made by Plaintiff to her account, and blocking Plaintiff's access to her account.

99.     As a result of Chase's failure to perform its contractual obligations, Plaintiff suffered damages, including economic losses from, <u>inter alia</u>, Chase's failure to credit Plaintiff's payments to her account, Chase's provision of incorrect tax information regarding Plaintiff, Chase's failure to correct its incorrect tax information, Chase's threats to foreclosure on Plaintiff and the Property, and damage to Plaintiff's credit.

**COUNT THREE:     UNJUST ENRICHMENT**

1-84.     Plaintiff hereby incorporates the allegations stated in Paragraphs 1 through 84, as if fully set forth herein.

100.     Chase received benefits in this case, including:

a.     Payments Chase accepted but failed to apply or credit to Plaintiff's account.

b.     Upon information and belief, fees accrued by inducing Plaintiff to go delinquent on her mortgage.

c.     Upon information and belief, fees accrued by failing to correct its error in the Final Modification.

d.     Upon information and belief, fees accrued by failing to honor the Corrected Modification.

e.     Upon information and belief, fees accrued by inducing Plaintiff not to make payments pursuant to the Corrected Modification.

21

101.    Chase did not pay, compensate, or otherwise credit Plaintiff for the benefits Chase received.

102.    Chase's failure to  pay, compensate, or otherwise credit Plaintiff for the benefits Chase received was to Plaintiff's detriment because, _inter alia_, Plaintiff did not receive timely credit for payments made to and accepted by Chase, Plaintiff incurred economic losses when induced to go delinquent on her mortgage loan, Plaintiff incurred economic losses when Chase failed to honor the Corrected Modification, and Plaintiff's credit was permanently and negatively affected.

**COUNT FOUR:        NEGLIGENT MISREPRESENTATION**

1-102.  Plaintiff hereby incorporates the allegations stated in Paragraphs 1 through 102, as if fully set forth herein.

103.    Chase supplied false information to the Plaintiff, including:

a.      Chase represented to Plaintiff that she could not modify her mortgage loan until she was delinquent on her account.

b.      Chase represented to Plaintiff that she should not make payments pursuant to a binding contract.

c.      Chase reported tax information to Plaintiff which did not accurately reflect the payments she had made.

104.    Chase failed to exercise reasonable care in communicating such information, for reasons which include:

a.      Upon information and belief, neither the HAMP guidelines nor any other authority requiring a borrower on a mortgage loan to be delinquent in order to be eligible for a loan modification.

b.      Upon information and belief, there is no authority requiring a borrower on a mortgage loan to stop making payments according to a loan or modified loan.

c.      Chase accepted payments from Plaintiff, but did not reflect these payments in its Form 1098 documents concerning interest payments made by Plaintiff.

105.    Upon information and belief, Chase made these statements to induce Plaintiff to act upon them for reasons which include, <u>inter alia</u>, that Chase accrued fees for servicing Plaintiff's account after Chase induced her to become delinquent, and continued to receive them as long as Plaintiff's account remained delinquent.

106.    Plaintiff justifiably relied upon Chase's statements, to her detriment, in ways which include:

    a.    Plaintiff went delinquent on her mortgage loan specifically because Chase represented to her that she was required to do so before she could modify her loan.

    b.    Plaintiff did not make a payment pursuant to the Corrected Modification when Chase returned a payment and instructed her accordingly.

    c.    Plaintiff filed the Form 1098 provided by Chase, and paid higher taxes as a result.

**COUNT FIVE:       CONVERSION**

1-106.   Plaintiff hereby incorporates the allegations stated in Paragraphs 1 through 106, as if fully set forth herein.

107.    Plaintiff made payments to Chase using her own funds.

108.    When Plaintiff made payments to Chase, Chase was entitled to take possession of such payments and apply them to Plaintiff's mortgage loan account.

109.    In some circumstances, Chase failed to credit Plaintiff's payments to her account, and instead held them in suspense.

110.    By doing so, Chase deprived Plaintiff of her property for an indefinite period of time.

111.    Chase's conduct in holding Plaintiff's payments in suspense, instead of applying them to her account, was wrongful, unlawful, and without Plaintiff's permission.

112.    Chase's conduct caused harm to Plaintiff by, _inter alia_, depriving Plaintiff of the ability to control her funds, depriving Plaintiff of the ability to make payments to her account, inducing the threat of foreclosure for Plaintiff, and negatively and permanently affecting Plaintiff's credit.

**COUNT SIX:**          **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

1-112.   Plaintiff hereby incorporates the allegations stated in Paragraphs 1 through 112, as if fully set forth herein.

113.    Chase knew, or should have known, that emotional distress was the likely result of its conduct.

114.    Chase's conduct was extreme and outrageous in that it, _inter alia_, falsely induced Plaintiff to go delinquent on her account, wrongly refused to correct the incorrect tax information in the Final Modification, wrongfully and willfully refused to honor the Corrected Modification, blocked Plaintiff's access to her account, and held Plaintiff's payments in suspense.

115.    Chase engaged in such conduct on repeated occasions and, at times, communicated its behavior directly to Plaintiff, such that Plaintiff feared she would lose her home, her finances, and/or her credit as a result of Chase's actions.

116.    As a result of Chase's conduct, Plaintiff has suffered severe emotional distress, including anxiety attacks, fear, stress, insomnia, heart palpitations, and shortness of breath.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff claims judgment against Chase and the following relief:

1.      Compensatory damages.

2.      Treble damages.

3.      Punitive damages.

4.      Attorney's fees and costs.

5.      Such other and further relief as this Court shall deem just, equitable, and proper.

Plaintiff demands a jury trial on all of the foregoing counts.

RESPECTFULLY SUBMITTED,
SARA JANE SABBAGH


By: /s/ Steven D. Ecker ct03762
      Steven D. Ecker
      James J. Healy
      Cowdery, Ecker & Murphy, L.L.C.
      280 Trumbull Street
      Hartford, Connecticut  06103
      (860) 278-5555
      (860) 249-0012 Fax
      ecker@cemlaw.com
      jhealy@cemlaw.com

      - Her Attorneys -

## CERTIFICATE OF SERVICE

I hereby certify that on May 21, 2013, I caused a copy of foregoing Plaintiff's Second Amended Complaint to be filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


/s/   Steven D. Ecker ct03762
Steven D. Ecker